[No. 1640.]

GUS. RUTHERFORD *v.* THE STATE.

1. MANSLAUGHTER—ADEQUATE CAUSE, in the statutory definition of manslaughter, means such cause as. in a person of ordinary temperament, would commonly excite passion sufficient to render the mind incapable of cool reflection.

2. SAME—CHARGE OF THE COURT—FACT CASE.—See this case for evidence in a trial for murder which required that the trial court, though not so requested, should have given the law of manslaughter in charge to the jury, but which did not require a charge upon negligent homicide.

3. SAME.—SELF-DEFENSE.—Note instructions on the law of self-defense which, though brief, are *held* adequate to the case as made by the proof, and quite as favorable to the defendant as he was entitled to expect.

4. CHARGE OF THE COURT.—Every theory of a case presented by the evidence, whether strongly or weakly supported thereby, demands of the trial court instructions to the jury directly and pertinently applied thereto. The strength of the evidence is for the determination of the jury alone.

APPEAL from the Criminal District Court of Harris. Tried below before the Hon. Gustave Cook.

The grand jury of Harris county, on October 9, 1883, presented an indictment in which it is charged that the appellant, with im-

plied malice aforethought, did, on the fifth day of August, 1883, kill and murder one John Williams, *alias* John Wilson, by striking him on the neck with a club, which was a deadly weapon. Appellant was found guilty of murder in the second degree, the offense charged by the indictment, and a term of five years in the penitentiary was assessed as his punishment.

Smith Wort, the first witness for the State, testified that he knew John Williams, deceased, who was sometimes called John Wilson. Deceased was killed by a blow dealt him by Gus. Rutherford, the defendant, in a barroom on Milam street, in the city of Houston, Harris county, Texas, about six weeks prior to this trial. Witness was present when the difficulty occurred. The deceased was standing behind a table in the barroom, when the defendant came in, and, in passing by the deceased, turned or stumbled over the latter's feet. The deceased told defendant there was plenty of room to walk without walking on his feet. Words not remembered by witness passed between the deceased and the defendant, when the deceased turned his back on the defendant, and made one or two steps from him, and then the defendant picked up a door bar and struck the deceased with it. The deceased fell, and the defendant walked out of the barroom into the street. The door bar was two by four inches, and about four and a half or five feet long. It was standing against the wall, three or four steps from defendant, when he took it and struck the deceased.

On cross-examination, the witness stated that the deceased cursed the defendant when the latter stumbled over his feet. There was but a narrow space between the wall and the table behind which the deceased was standing. Witness saw an unopened knife in the hands of the deceased when he fell. Witness did not see deceased try to open the knife, and would have seen such an attempt if deceased had made it.

Jim May, for the State, testified that he was present when the defendant struck and killed the deceased. Defendant stumbled over deceased's feet, and the deceased cursed him, and then handed a bottle of whisky to Smith Wort, and walked close up to defendant and cursed him again. Deceased then turned his back on defendant and walked two or three steps, when the defendant picked up a door bar that was against the wall and struck the deceased with it. Deceased died in a very short time. After he fell, however, he got up and walked into another room. Defendant, after striking the deceased once with the

wooden door bar, walked out of the barroom.  As he was going out, some one said, "Gus., you should not have struck him;" and the defendant replied: "What business of yours is it?"

On cross-examination, the witness said he did not see the deceased try to open the knife which was found in his hands after he fell.

Dr. Rutherford, for the State, testified that he examined the deceased soon after his death.  It was caused by an occipital blow from some blunt instrument, which had the effect to dislocate the cervical joint of deceased; "that is, he was struck on the back of the head, and the blow dislocated the neck."  The blow was received full on the back of deceased's head.  The State rested on the foregoing evidence, and—

John Ransom was the first witness examined by the defense. He testified that he knew both the defendant and the deceased, and was present when the latter was killed.  Deceased was behind a table, which was close to the wall and in a corner of the barroom.  Defendant came in, and, in passing the deceased, stumbled over the latter's feet.  Deceased cursed the defendant for a G—d d—n son of a bitch, and asked him what in the h—ll he meant by stumbling over his feet.  Defendant asked the deceased to excuse him.  Deceased kept on cursing the defendant, and the latter said to him: "If you don't let me alone, I'll put you out of here."  Witness told the deceased to let the man alone; that Gus. had asked his pardon, and what more did he want the man to do; and if he wanted Gus. to get down on his knees and beg his pardon.  Deceased then handed a bottle of whisky to Smith Wort, and walked over to where Gus. was, and cursed him again.  Then he turned his back to Gus., made one step from him, and ran his hand in his pocket.  Gus., the defendant, seemed to be watching the deceased.  Deceased then made another step in the same direction, and pulled a knife.  It was all done quickly.  Deceased put his hands on the knife, and seemed to be trying to open it.  After the second step, he turned half way around, with his hand on the knife, and, as he got half way around, the defendant pulled up the piece of wood, which was standing right near him, against the wall, and struck the deceased a lick on the back of the head.  He struck the deceased but one lick, and then laid the piece of wood down, and walked out of the house.  Deceased did not die immediately. He fell when he was struck, but afterwards got up and staggered into the next room.  Just before he died, the witness went

to him and asked him if he could do anything for him, and he replied: "Go away, you d—d son of a bitch."

On his cross-examination, this witness said that the deceased was trying to open his knife when the defendant struck him, and was turning on the defendant. Defendant did not come from behind the table and follow up the deceased, and did not have to go anywhere to get the stick. It was close to him, and he just reached out his arm to get it.

Fred. King, for the defense, testified that he saw the difficulty which resulted in the death of the deceased. Defendant stumbled over deceased's feet, and asked deceased to excuse him. Deceased kept on cursing the defendant. John Ransom told the deceased to go away and let the defendant alone, or he would put him out of there, that he was tired of being cursed. Deceased then walked across the room to where Smith Wort was and gave him a bottle of whisky, and then returned to where the defendant was standing by the table, turned his back on defendant, made a step or two away from him, and drew a knife. Deceased was turning on the defendant, when the latter picked up a door bar and struck him. Deceased, as he was turning, had both hands on the knife, and, as it seemed to the witness, had turned about half around when the defendant struck him.

On cross-examination, the witness stated that the deceased did not open the knife. He did not have time to open it, but had both hands on it, and was trying to open it when the defendant struck. When deceased turned his back on defendant, just before he drew his knife, he was close to the defendant. The latter was behind the table, but came around from behind it when he struck the deceased.

Re-examined by the defense, the witness stated that the table was about six feet long and two feet wide. Defendant and deceased were about the width of the table apart when deceased turned away from defendant, just before drawing his knife; deceased was at one corner of the table and defendant at the opposite corner, about two feet distant. Defendant made about one step behind the table to get the door bar, and then stepped back to his previous position. This brought him a little around the table, and is what witness meant by his statement that the defendant came from around the table.

Two witnesses for the defense testified that the deceased bore the character of a desperate man, and one of them stated that

the defendant, whom he had known for two years, was a quiet and peaceable citizen.

One witness for the State testified that he knew the reputation of John Ransom, one of defendant's witnesses, for veracity in the neighborhood where he lives; that he is quite a story-teller, and his reputation for truth-telling bad.

On the right of self-defense, the charge of the court instructed the jury to acquit the defendant if they believed "from the evidence that, at the time, the deceased was making such hostile demonstration as to raise, reasonably, in the mind of the defendant the apprehension of immediate danger of his life or serious bodily harm, and that he acted under that apprehension, and killed John Williams."

A new trial being refused by the trial court, the defendant appealed.

*Presley K. Ewing*, for the appellant: The court committed an error of omission in its charge to the jury, in this: The court failed to instruct the jury in and concerning the law of negligent homicide of the second degree.

If A unlawfully strikes B with a weapon or other instrument, and thus causes B's death, the weapon or other instrument as used by A, together with the circumstances surrounding the act, not evincing an intention on the part of A to take B's life, A is guilty of negligent homicide of the second degree. (Code of Criminal Procedure, Arts. 676 and 678; Penal Code, Arts. 508, 510, 593, 604; *Jennings* v. *The State*, 7 Texas Ct. App., 354; *Perry* v. *The State*, 44 Texas, 473; *Lester* v. *The State*, 2 Texas Ct. App., 433; Blackstone's Commentaries, vol. 4, secs. 191 and 193; Russel on Crimes, vol. 1, pp. 636 and 638; English C. L. Reports, 32, p. 576; 2 Lew. C. C., 214; Bishop's Criminal Law, vol. 2, sec. 681; United States Digest, vol. 9, citing 58 Indiana, 159).

Negligent homicide of the second degree, under the Code, corresponds to involuntary manslaughter at common law, arising from the commission of an unlawful act, not amounting to a felony.

"And any one who, voluntarily, knowingly, and unlawfully intends hurt to the person of another, though he intend not death, yet, if death ensue, is guilty of murder or manslaughter, according to the circumstances of the nature of the instrument used, and the manner of using it.   *   *   *." It has been shown that where, from an action, unlawful in itself, done deliberately,

and with mischievous intention, death ensues, though against or beside the original intention of the party, it will be murder, and it may be here observed that if such deliberation and mischievous intention do not appear (which is matter of fact, and to be collected from circumstances), and the act was done heedlessly and incautiously, it will be manslaughter. (Russell on Crimes, vol. 1, pp. 336 and 338.) In Conner's case, a mother being angry with one of her children, took up a small piece of iron used as a poker, and on his running to the door of the room, which was open, threw it after him, and hit another child who happened to be entering the room at the moment, in consequence of which the latter died. Park, Judge, held this to be manslaughter, although it appeared the mother had no intention of hitting the child with whom she was angry, but only intended to frighten him. The learned judge said if a blow is aimed at an individual unlawfully (and this was undoubtedly unlawful, as an improper mode of correction) and strikes another and kills him, it is manslaughter; and there is no doubt if the child at whom the blow was aimed had been struck and died, it would have been manslaughter, and so it is under the present circumstances. (Eng. C. L. Reps., 32, 576.) In Wild's case, the deceased had entered the prisoner's house in his absence, and on his return was desired to withdraw, but refused to go. Upon this, words arose, and the prisoner proceeded to use force, and by a kick, which he gave deceased, caused an injury which produced his death. Alderson, B., said: "A kick is not a justifiable mode of turning a man out of your house, though he be a trespasser. If the deceased would not have died but for the injury he received, the prisoner having unlawfully caused that injury, he is guilty of manslaughter." (2 Lew. C. C., 214.)

Blackstone thus speaks of manslaughter: "Manslaughter is therefore thus defined the unlawful killing of another without malice, either expressed or implied, which may be either voluntarily, upon a sudden heat, or involuntarily, but in the commission of some unlawful act." * * * Again: "The second branch, or involuntary manslaughter, differs also from homicide excusable by misadventure, in this, that misadventure always happens in the commission of a lawful act, but this species of manslaughter in consequence of an unlawful one." (Vol. 4, secs. 191, 193.)

Under the Penal Code of Texas, involuntary manslaughter, *eo nomine*, does not exist. (Penal Code, Arts. 593, 604.) As de-

fined at common law, it is to be found in the chapter on negligent homicide.    (Penal Code, Arts. 508, 510.)

The point raised under the second assignment is so elementary and so perfectly well settled by a host of authorities, that it would be an affectation of learning to extend our citation of them.    Apply the principle to the charge of the court and the facts of the case.    Under the court's charge, if the jury found the defendant's act in striking the deceased an unlawful one, nothing remained but for them to find him guilty of murder. Whereas, had the court charged the law of negligent homicide of the proper degree, the intent of the defendant to take life or not, as evinced by the character of the instrument of death, the manner of its use, and the surrounding circumstances, would have been fairly submitted to the jury for their determination, and the defendant thus given the benefit of the legitimate expectation of a much lighter penalty.    This was a question of fact, and the court had no right to usurp control over the dominion of the jury.    (See Russell, *ante.*)

"The unlawful and felonious killing of a human being without malice, but voluntarily on a sudden heat, is voluntary manslaughter.    Involuntary killing in the commission of an unlawful act, is involuntary manslaughter.    *    *    *    The question as to whether the manslaughter committed was voluntary or involuntary, is one wholly for the jury." (U. S. Digest, vol. 9, citing *Bruner* v. *The State*, 58 Ind., 159.)    The court's charge is virtually this:    If the jury do not believe, from the evidence, that the defendant acted in self-defense, then he is guilty of murder.    In other words, if the act of the defendant in striking the deceased was unlawful, the law pronounces him a murderer.    This is not the law as applicable to the evidence, as a reference to the statement of facts reveals.    The question arises, does the evidence support the point presented, and justify the objection raised?    Had negligent homicide been charged, and the defendant found guilty of that offense, would a cool, dispassionate mind, searching the record in the light of the law, find evidence to support the verdict?    Surely the prosecution would not be heard to clamor for a more liberal test, nor the defendant be driven to a more rigid one.    We answer the question in the affirmative, and direct the court's attention to the following evidential facts in point:

1.    The instrument of death was a stick of wood, and nothing in evidence to show its weight; nor was the stick produced on

the trial. The court, having charged on the hypothesis of the deadly character of the instrument, should have given the defendant the benefit of the *effect* of a charge on the contrary hypothesis. (*Perry* v. *The State*, 44 Texas, 473; 2 Texas Ct. App., 433.) Joel Bishop, in his excellent work on criminal law, considering the deadly character of instruments of death, favors the committing "all questions of this sort to the mere advisory list;" for the learned author "cannot discover by what principle of policy or right a judge is permitted, where the law requires malice aforethought to constitute murder, to tell the jury that, whatever their actual belief may be, they must find the prisoner guilty of this particular malice, provided they believe he produced death with a particular kind of weapon." (Vol 2, sec. 681.) In this State a judge cannot fetter or cramp a jury by acting in an advisory capacity. The advisory list falls here in the domain of fact. If the question presenting itself be a naked question of law and fact, the judge explains the law, the jury determine the fact. "The jury are the exclusive judges of the facts in every criminal case, but not of the law in any case." (Code Crim. Proc., Art. 676.) It is beyond the province of a judge sitting in criminal causes to discuss the facts, etc. (Code Crim. Proc,, Art. 678.) But suppose the instrument was a "deadly weapon," does it follow, as a matter of law, that it would be regarded as deadly in the particular instance of this case? Certainly not. "If the deadly weapon is employed neither with direct aim, nor in a manner likely to be deadly in the particular instance"—a question of fact—"it is not to be legally regarded as deadly in the particular instance. This proposition may be viewed as resulting rather from the general course of decision than as being established directly by any express adjudication." (Bishop's Criminal Law, vol. 2, sec. 681.) We revert to the evidence.

2. The defendant struck but one blow, with every opportu to strike again and again, which it is reasonable to suppose he would have done had the fires of "malice" flamed in his bosom, as the prosecution would contend, with a "perpetual glow."

3. The stick of wood was lying in arm's reach of the defendant; was suddenly seized, and the blow hastily dealt.

4. The evidence showed the defendant to be a peaceable, quiet, amiable citizen, exemplary in his deportment.

5. The evidence shows that the death of the deceased was

caused by an occipital blow, having the effect to partially dislo-
cate the cervical joint.

6.   This court judicially knows—it is a fact of science well
recognized—that the slightest blow, even a bumping of the
head, may produce death by dislocating. as it were. the joint of
the neck.   The point raised is, we apprehend, fairly before the
court.   An extension of our argument on this branch of the
case we deem unnecessary.

The court erred in its charge to the jury in this:   The court
charged the jury as follows:   " Or if you believe from the evi-
dence that at the time deceased was making such *hostile* dem-
onstration." etc., because the word hostile, as used by the court,
is an interpolation into the rule of self-defense, unsupported by
law, and, under the facts of the case, calculated to prejudice
the rights of the defendant.

If the circumstances in evidence were calculated to create a
reasonable apprehension of fear in the mind of the defendant
of immediate danger to his life or limb, it is immaterial whether
there was, in fact, real danger impending.   (Webb's Cr. Digest.
sec. 358; *Horbach* v. *The State,* 43 Texas. 258; *Munden* v. *The
State,* 37 Texas, 353; *Lister* v. *The State,* 3 Texas Ct. App., 17;
*Bode* v. *The State,* 6 Texas Ct. App.. 424; *Marnoch* v. *The State,*
7 Texas Ct. App.. 269; *Richardson* v. *The State,* 7 Texas Ct.
App., 486; *Rodriguez* v. *The State,* 8 Texas Ct. App.. 129; *Jordan*
v. *The State,* 11 Texas Ct. App.. 435.)

The law of self-defense as given in charge by the court, when
analyzed, resolves itself into these:

1.   A *hostile* demonstration on the part of the deceased.

2.   Reasonable apprehension of danger, etc., on the part of
defendant.

To the latter division we urge no objection; the former we
contend is erroneous, either standing alone, or taken in connec-
tion with the latter branch.   If A points at B an empty gun,
and B, not knowing the gun is unloaded, has reasonable grounds
to believe that A is about to take his life, and. thus believing,
kills A, the fact subsequently developed to B that his life was,
in fact, in no danger, amounts to nothing.   So in this case, who
knows what the purpose of deceased might have been in draw-
ing his knife—perhaps to cut a chew of tobacco.   This certainly
would not have been *hostile;* yet if the act created in the mind
of the defendant a reasonable apprehension of immediate danger
to his life or limb, he would be innocent.   This, notwithstand-

ing the act of the deceased might not have been *hostile* in the least. As it was under the charge, the jury could not acquit the defendant unless they found, as a *distinct* fact, that the deceased made a *hostile* demonstration.

The verdict is "manifestly against the weight of the evidence," in this: The evidence, when applied to the rule of law given the jury in charge by the court, clearly shows that the defendant acted in self-defense in taking the life of the deceased. (Penal Code, Art. 573; *Homberg* v. *The State*, 12 Texas Ct. App., 1; *Ross* v. *The State*, 10 Texas Ct. App., 455; *West* v. *The State*, 2 Texas Ct. App., 460; Webb's Criminal Digest, secs. 358 and 571.)

The whole testimony is capable of being reconciled, and, when so reconciled, shows the defendant to have acted in self-defense. If the deceased was turning on the defendant, attempting to open his knife, the defendant had a right to strike. A person assailed is not bound to retreat. (Penal Code, Art. 573; 2 Texas Ct. App., 460.) If defendant's life seemed endangered he may act promptly without resorting to other means before killing his assailant. (Webb's Criminal Digest, sec. 358.) Was the deceased turning? The State's witness thought not. The defendant's witnesses swore positively that he was. A positive witness is worth a dozen uncertain or negative ones. (Webb's Criminal Digest, sec. 571.) Assuming, however, that up to this point there is a conflict in the evidence, the question forces itself, which set of witnesses is perjured or mistaken, and may the answer be gathered from the evidence? To the first branch of the question we answer: The State's. To the second: It may. A physical fact exists, uncontroverted, incontrovertible, clear. The deceased was struck on the back of the head with a stick, clumsy and difficult to wield. The deceased must then, we submit, in the very nature of things, have been sideways to defendant, for otherwise, standing erect, he would have been struck on the jaw or side of his head. Doctor Rutherford testified, for the State, that the death of deceased was caused by a blow from some blunt instrument, received full in the back of his head. The defendant's witnesses have spoken truly. This physical fact " comes in aid of their credit stronger than all oaths." In its presence, the conclusion is irresistible—the deceased was turning—turning with a knife in his hands, attempting to open it; for, though some of the witnesses did not see the knife at this instant, all agree that deceased fell with a knife in his

hands. What then, in the name of all reason—in the name of that "immutable law which we have sucked in and imbibed from nature"—was the defendant to do ? Wait for the knife to be plunged through him ? Grapple the demon. with his naked hands, and " die game?" What folly would this be ! The defendant stands justified in having acted promptly—he knew the desperate character of the deceased, the knife was being opened, there was no time to reason why—no time for deliberation or explanation.

" There was but to do or die ?"

*J. H. Burts*, Assistant Attorney General, for the State.

ON MOTION FOR REHEARING.

Willson, Judge. On a former day of this term the judgment in this case was affirmed without a written opinion. When the case was submitted it was upon brief for the State only, there being no appearance for the defendant by brief or otherwise. Upon our examination of the case at that time, finding no exceptions in the record to the charge of the court, and that no special charges had been requested by the defendant, although we believed the charge should have instructed the jury upon the law of manslaughter, we were of the opinion that the omission to do so, not being excepted to, was not such error as was calculated to injure the rights of the defendant, and did not, therefore require a reversal of the judgment. On this motion for rehearing counsel for defendant has, by an able brief, called our attention more particularly to the questions in the case, and upon a re-examination of the evidence in the case, and of the authorities cited by counsel, we are convinced that our former view and disposition of the case were erroneous, and we therefore grant the motion for rehearing, and set aside the judgment of affirmance.

Upon a careful review of the facts in the case, we are of the opinion that a charge upon the law of manslaughter was required, and that the failure of the court to give such charge was calculated to prejudice the rights of the defendant. It is true that the attention of the court was not called to this omission, either by exception to the charge or by charges requested, but it is made a ground for new trial, and being such error, in our judgment, as was well calculated to injure the rights of the defendant, we cannot refuse to consider it. That our opinion may

be understood, we will recite some of the testimony in the case, substantially, as we find it in the record:

Deceased, defendant and several others were in a saloon. In passing deceased the defendant stumbled over his (deceased's) feet, and deceased cursed him and called him a d—d s—n of a b—h. Defendant asked deceased to excuse him, but deceased kept on cursing him, although persons present tried to quiet him and prevail upon him to desist. Deceased handed a bottle of whisky to one of the persons present, and then walked up to defendant and cursed him again, and then turned his back on defendant as if to walk away, at the same time putting his hand into his pocket and drawing from thence a knife, which he seemed to be trying to open with both hands, and he was in the act of again turning upon the defendant—had turned about half way around—when defendant, without moving from his position, seized a piece of timber, which was near by, and struck deceased one blow on the head with it, and then threw down the piece of timber and walked out of the house. The blow thus inflicted produced the death of deceased in a few minutes. Deceased was a notoriously desperate man. This was his general reputation. Defendant is an amiable, peaceable, quiet citizen. When deceased fell a knife was found in his hand, but it was unopened. There is but little conflict in the evidence, and the above statement of the case is not materially contradicted by any of the testimony.

Would not these facts justify the conclusion that the homicide might have been committed under the immediate influence of sudden passion arising from an adequate cause? If the defendent struck the mortal blow, acting under the immediate influence of sudden passion, either anger, rage, sudden resentment, or terror, rendering his mind incapable of cool reflection, and if this sudden passion arose from an adequate cause, then the homicide would not be murder, but manslaughter.

Was there adequate cause to justify sudden passion sufficient to render the mind incapable of cool reflection? By adequate cause the law means such cause as would commonly produce passion in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Here the defendant had been grossly insulted and abused by the language of the deceased, and these insults and abuse were being continued, and deceased was in the act apparently of preparing to make a deadly assault upon defendant with a knife; and, besides this, the deceased was

a notoriously desperate man. Such being the facts, we think it very natural that a person of ordinary temper would be aroused to a degree of sudden passion sufficient to render his mind incapable of cool reflection. It would require, we think, a man of extraordinary coolness and bravery to remain free from sudden and violent passion, and to refrain from prompt and effective action under such circumstances. While such a state of facts may not constitute justifiable homicide, still we think they would well warrant a jury in finding that they did not constitute murder, and therefore the issue of manslaughter should have been submitted in the charge.

"Every theory presented by evidence in the case demands of the court a charge thereon, whether strongly or weakly supported by the testimony. If there be evidence tending to support it, the law must be directly and pertinently applied thereto. The jury, and the jury alone, must pass upon the strength of the evidence which tends to support the theory. Nor can the evidence be so full and complete in favor of one theory as to preclude evidence, or excuse the court in refusing or failing to charge the law relative to another theory." (*McLaughlin* v. *The State*, 10 Texas Ct. App., 340.)

We are of the opinion that the facts of this case did not require a charge upon the law of negligent homicide, and that the court therefore did not err in omitting to give such charge.

While the charge of the court upon self-defense is very brief, still it is comprehensive, and more favorable to the defendant, perhaps, than the rules of law would warrant, and he has no good reason to complain of it.

We shall not pass upon the question as to the sufficiency of the evidence to support a conviction for any degree of homicide. That is a question primarily for the jury to determine, under proper instructions from the court.

Because the court erred in failing to charge the law of manslaughter, and because we think this omission in the charge was calculated to injure the rights of the defendant, the judgment is reversed and the cause remanded.

*Reversed and remanded.*